# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SUZANNE WILLMON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-04-S-1108-NE** |
| | ) | |
| **METROPOLITAN LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Suzanne Willmon, a former employee of Peoples State Bancshares, Inc., filed this action under sections 1132(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[1] Plaintiff also asserted supplemental state law claims for breach of contract and bad faith failure to pay insurance benefits.

Plaintiff claims she was wrongfully denied long-term disability benefits pursuant to her employer's group, long-term, disability insurance policy.[2] The policy was underwritten by defendant, Metropolitan Life Insurance Company ("Met Life" or "defendant"). The action now is before the court on defendant's motion for

---

[1] Plaintiff originally filed suit in the Circuit Court of Jackson County, Alabama, and defendant timely removed the action to this court on May 28, 2004. *See* doc. no. 1 (Notice of Removal).

[2] *See* Complaint, appended to doc. no. 1 (Notice of Removal).

summary judgment.[3]  Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes the motion should be granted.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

---

[3] Doc. no. 8.

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## I.  SUMMARY OF FACTS[4]

### A.    Plaintiff's Employment With Peoples State Bancshares, Inc.

Plaintiff Suzanne Willmon was employed by Peoples State Bancshares, Inc.

("Peoples"), in various capacities from 1983 until 1996.[5] Her last position, Assistant

Vice-President, primarily required her to perform marketing and public relations

duties, including coordinating publications in local media, public speaking, keeping

in touch with customers, and coordinating events.[6]

---

[4] The Initial Order, Appendix II, provides the following with respect to responses to the statement of facts in a moving party's motion for summary judgment:

> The first section must consist of only a response to the moving party's claimed undisputed facts, and shall contain a specific response to each numbered sentence in the movant's list of claimed undisputed facts. The response must consist of the word "Admitted," or the word "Disputed," or a short explanatory phrase such as "Admitted but not material," or "Admitted but context clarified in brief." Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

Doc. no. 4 (Initial Order Governing All Further Proceedings), Appendix II, at iii-iv (emphasis in original). Plaintiff did not attempt to controvert defendant's statement of facts as required by the Initial Order. Accordingly, defendant's statement of facts are deemed admitted for summary judgment purposes. Likewise, those facts which were set forth by plaintiff in her brief, but were not disputed by defendant in its reply brief, will be deemed admitted. *See id.* at iv-v.

[5] *See* defendant's evidentiary submission, appended to doc. no. 8,  Tab 1 (Affidavit of Laura Sullivan), Exhibit B (Claim File), at document bearing Bates Stamp No. Met Life 00346.

[6] *See id.* at document bearing Bates Stamp No. Met Life 00337.  Plaintiff listed the following specific duties encompassed by her job: *i.e.,*

**B.     The People's Plan**

As a full-time employee, plaintiff obtained long-term disability insurance coverage under an employee welfare benefit plan ("the People's Plan" or "the Plan") issued by Met Life and governed by ERISA.[7]   Met Life served as the claims

---

1.    Public Relations story in Newspaper about Peoples State Bank once a week.
2.    Speak to a class at the School (Grammer [sic], Middle & High School) on Banking once a week.
3.    Send Birthday Cards to New Customers.
4.    Send flowers to Funerals of people in the Community.
5.    Send Get Well Cards to Customers who are known to be sick or in the Hospital.
6.    Watch for Birth Announcements in the paper and send letters to all New Parents from Peoples State Bank.
7.    Attend all Grand Openings of New Businesses in the Market area, and send flowers to that Business from the Bank.
8.    Set up Refreshments for Customer Appreciation Day once a month in the Bank lobby.
9.    Sponsor Student Of The Month at the School — present Student with a $50.00 Savings Bond.
10.   Sponsor and Coordinate a Career Day at the High School once a year.
11.   Volunteer to help raise money for all the local charities.
12.   Develope [sic] and Coordinate a New Account Contest for all Employees of Peoples State Bank to participate in — with Cash Prizes.
13.   Develope [sic] and Coordinate an Essay Contest for Students on various subjects — give Savings Bonds to top (3) Students sponsored by Peoples State Bank.
14.   Develope [sic] and Coordinate a Speech Contest for Students at the School. Give Savings Bonds as prizes.
15.   Send Thank You Cards to new Customers.
16.   Coordinate Senior Citizens Programs.
17.   Sponsor Summer Reading Program at Library — Savings Bonds to top Readers.

*Id.*

[7] *See* defendant's evidentiary submission, appended to doc. no. 8,  Tab 1 (Affidavit of Laura Sullivan), at Exhibit A (People's State Bancshares, Inc. Long-Term Disability Plan).  The term "employee welfare benefit plan" is defined by ERISA as

administrator for the Plan, and was afforded both the discretionary authority to interpret terms of the Plan with regard to benefit claims such as plaintiff's, and the authority to decide claim appeals.[8]   The pertinent provisions of the Plan define a disability as follows:

> **"Disability"** or **"Disabled"** means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:
>
> 1.   You are unable to perform each of the material duties of your regular job; and
>
> 2.   After the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or
>
> 3.   You, while unable to perform all of the material duties of

---

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of . . . disability.

29 U.S.C. § 1002(1).  Plaintiff acknowledges the Plan is covered by ERISA.  *See* Complaint, at ¶ 4 ("[T]he above-described policy of insurance or plan is subject to the provisions of 29 U.S.C. § 101, *et seq.,* more commonly known as Employment [sic] Retirement Income Security Act.").

[8] Sullivan Affidavit, at Exhibit A (People's State Bancshares, Inc. Long-Term Disability Plan), at document bearing Bates Stamp No. Met Life 00364 ("In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.").

your regular job on a full-time basis, are:

a.   performing at least one of the material duties of your
regular job or any other gainful work or service on
a part-time or full-time basis; and

b.   earning currently at least 20% less per month than
your indexed Basic Monthly Earnings due to that
same Injury or Sickness.[9]

The Plan requires long-term disability claimants to provide proof of a disability

meeting the foregoing definition in order to receive benefits, as follows:

**1.    Disability Benefit**.

*When we receive proof that you are Disabled*, we will pay a
Monthly Benefit in accordance with the SCHEDULE OF BENEFITS.

However, the amount of the Monthly Benefit when added to any
compensation you may earn while Disabled, cannot exceed your
Indexed Basic Monthly Earnings.  When this happens, your Monthly
Benefit will be reduced by the amount in excess of your Indexed Basic
Monthly Earnings.

The Monthly Benefit will be paid to you after completion of the
Elimination Period, shown in the SCHEDULE OF BENEFITS, *provided
you remain Disabled and proof of continued Disability is submitted, at
your expense, to us upon request.*[10]

Proof of a claim must be presented "not later than 90 days . . . following the end of

---

[9] *Id.* at document bearing Bates Stamp No. Met Life 00355 (boldface emphasis in original).

[10] *Id.* at documents bearing Bates Stamp Nos. Met Life 00356-00357 (boldface emphasis in original, italicized emphasis supplied).  The term "Elimination Period" is defined in the Plan as "The later of 180 days or the end of a Period of Disability for which you are receiving Short Term Disability Benefits under This Plan."  *Id.* at document bearing Bates Stamp No. Met Life 00350.

the Elimination Period in the case of Long Term Disability Benefits."[11]  "If notice or proof is not given on time, the delay will not cause a claim to be denied or reduced as long as the notice or proof is given as soon as possible."[12]

The Plan also provides the following with regard to a claimant's right to request a review of a denial of benefits:

> In the event a claim has been denied in whole or in part, you or, if applicable, your Eligible Survivor can request a review of your claim by Metropolitan.  This request for review should be sent to Group Insurance Claims Review at the address of Metropolitan's office which processed the claim *within 60 days after you or, if applicable, your Eligible Survivor received notice of denial of the claim.*  When requesting a review, please state the reason you or, if applicable, your Eligible Survivor believe the claim was improperly denied and submit any data, questions or comments you or, if applicable, your Eligible Survivor deems appropriate.[13]

## C.    Plaintiff's Claim for Long-Term Disability Benefits

Plaintiff initially filed for long-term disability benefits in October of 1996, due to vocal cord dysfunction and asthma.[14]   On the Attending Physician Statement submitted with her application, Dr. Carol Motley indicated plaintiff was currently undergoing treatment and stated, "hopefully [her] condition will be successfully

---

[11] *Id.* at document bearing Bates Stamp No. Met Life 00360.

[12] *Id.*

[13] *Id.* at document bearing Bates Stamp No. Met Life 00363 (emphasis supplied).

[14] Defendant's evidentiary submission, appended to doc. no. 8, Tab 1 (Affidavit of Laura Sullivan), Exhibit B (Claim File), at documents bearing Bates Stamp Nos. Met Life 00345-00346.

treated and she will be able to resume work."[15]  On March 28, 1997, Met Life noted

in plaintiff's file that her doctors expected her condition to last at least five years.[16]

After reviewing plaintiff's application and the medical information submitted, Met

Life approved plaintiff's claim, and it informed her on May 14, 1997 that she would

receive benefits effective retroactively to February 17, 1997.[17]  In Met Life's letter to

plaintiff, it reminded her that it would "periodically require updated medical

certification for [her] claim."[18]

   Met Life continued to receive medical updates from plaintiff through

approximately the end of 1997.  On September 9, 1997, Met Life noted that plaintiff

had stopped the experimental Bio Tox Therapy she had been receiving for her vocal

cord dysfunction, because the treatments were ineffective.[19]  Met Life also received

a letter dated June 16, 1997, from Dr. Thomas L. Davis, Associate Professor of

Neurology at Vanderbilt University Medical Center.  Dr. Davis stated that, at that

time, plaintiff was "100% disabled because of her voice."[20]  Met Life noted in

---

[15] *Id.* at document bearing Bates Stamp No. Met Life 00345.

[16] *Id.* at document bearing Bates Stamp No. Met Life 00001.

[17] *Id.* at documents bearing Bates Stamp Nos. Met Life 00288-290.

[18] *Id.*

[19] *Id.* at document bearing Bates Stamp No. Met Life 00007.

[20] *Id.* at document bearing Bates Stamp No. Met Life 00083.  Dr. Davis described the history of plaintiff's vocal disorder as follows:

   Ms. Atchley [plaintiff's former name] is a 30-year-old woman with a long history of asthma complicated by paradoxical vocal cord movements.  Ms. Atchley states that

plaintiff's file on September 9, 1997, that Dr. Mark Courey at the Vanderbilt Voice Center recently had informed plaintiff that her condition was not expected to improve, and that she was "totally & perm[anently] disabled."[21]  On November 11, 1997, Met Life noted that plaintiff had exhausted all non-surgical treatment options, and on November 17, 1997, plaintiff's speech therapist indicated she had reached her maximum level of medical improvement.[22]  Plaintiff informed Met Life in December of 1997 that she did not intend to return to work after she began receiving Social Security disability benefits, because she preferred to stay home and care for her children.[23]

Met Life paid plaintiff's benefits until October of 1998, at which time it suspended payments due to plaintiff's failure to provide updated medical information

---

she was hospitalized late last year for a typical asthma exacerbation and during that hospitalization developed stridor and severe shortness of breath.  It was at that time that she acutely lost her voice.  She then underwent multiple systematic treatments including high dose benzodiazepine and antibiotics.  Following one course of antibiotics her voice improved significantly but her symptoms then exacerbated after she returned to work for one week.  She now states that breathing most of the time is difficult for her and that she rarely speaks above a whisper.  There are, however, brief times when her voice is near normal.  After speaking most of the day, she states that her voice becomes unintelligible.  Her throat feels full but does not hurt.  She complains of difficulty swallowing solids but not liquids.  She denies any tongue biting, jaw clinching, or involuntary tongue protrusions.

*Id.*  The court notes, however, that Dr. Davis was not treating plaintiff for her voice disorder; instead, he appears to have been evaluating her to determine the cause of a tremor.  *See id.*

[21] *Id.* at document bearing Bates Stamp No. Met Life 00007.

[22] *Id.* at documents bearing Bates Stamp Nos. Met Life 00009-00010.

[23] *Id.* at document bearing Bates Stamp No. Met Life 00012.

upon Met Life's request.[24]  Met Life claims it sent plaintiff two written requests for

updated medical records, but plaintiff claims she did not receive either request. In

May of 1999, after learning her benefits had been suspended, plaintiff requested

forms for her medical providers to complete.[25]  Plaintiff subsequently forwarded the

completed forms, along with updated medical records, to Met Life, and Met Life

notified her on October 13, 1999, that it would reinstate her claim and approve the

payment of continued benefits, retroactive to October of 1998.[26]

In the meantime, during March of 1999, plaintiff underwent surgery to have a

permanent tracheostomy placed in her throat for opening up her airway.[27]  A valve

was installed in the tracheostomy to allow plaintiff to speak,[28] but plaintiff still

sometimes experienced significant difficulty communicating.[29]  Met Life noted in

---

[24] *Id.* at document bearing Bates Stamp No. Met Life 00229.

[25] *Id.* at document bearing Bates Stamp No. Met Life 00016.

[26] *Id.* at documents bearing Bates Stamp Nos. Met Life 00060-00062.

[27] *Id.* at documents bearing Bates Stamp Nos. Met Life 00156-00158.  One medical dictionary
defines a "tracheostomy" as

> the surgical creation of an opening into the trachea through the neck, with the
> tracheal mucosa being brought into continuity with the skin; also, the opening so
> created.  The term is also used to refer to creation of an opening in the anterior
> trachea for insertion of a tube to relieve upper airway obstruction and to facilitate
> ventilation.

*Dorland's Illustrated Medical Dictionary* 1727 (28th ed. 1994).

[28] *Id.* at document bearing Bates Stamp No. Met Life 00021.

[29] *Id.* at documents bearing Bates Stamp Nos. Met Life 00018-00021.

-10-

plaintiff's file on September 10, 1999, that, due to the tracheostomy, it was *possible* that continued coverage beyond May of 1999 would be warranted.[30]   However, Met Life subsequently noted that, *despite* the tracheostomy, plaintiff might be able to return to some type of work after a period of recovery, and that additional medical records would be necessary to evaluate that possibility.[31]   Plaintiff subsequently underwent a second surgery on September 15, 1999, because her tracheostomy had begun to shut down.[32]

Met Life received a completed questionnaire from Dr. Courey on February 10, 2000.   Dr. Courey indicated that plaintiff had reached a maximum level of improvement, and stated that plaintiff's voice was permanently hoarse.  He also stated that plaintiff should avoid dry, smokey, or chemical-filled air, and that she would require the intermittent use of humidifiers.[33]  Approximately one week later, Met Life noted in plaintiff's file that "her doctors are supporting a permanent and total disability."[34]

Met Life arranged for plaintiff to undergo a home evaluation by registered nurse Opal Newcomb on November 7, 2000.   Following her evaluation, Ms.

---

[30] *Id.* at document bearing Bates Stamp No. Met Life 00018.

[31] *Id.* at documents bearing Bates Stamp Nos. Met Life 00019-00020.

[32] *Id.* at document bearing Bates Stamp No. Met Life 00020.

[33] *Id.* at document bearing Bates Stamp No. Met Life 00053.

[34] *Id.* at document bearing Bates Stamp No. Met Life 00022.

Newcomb stated the following with regard to plaintiff's potential for returning to work:

> The claimant has indicated she does not plan to return to work due to her disabilities and due to the negative impact of any potential employment. The claimant has indicated she requires daily rest in between activities. The claimant has indicated any type of stress and anxiety increases her symptoms, requiring more oxygen. The claimant also requires daily suctioning throughout the day as well as dressing changes around the trach site. Due to these reasons an eight hour work day would most likely be very difficult for the claimant and any potential employer and would most likely have a negative impact. The claimant does enjoy using her home computer. The claimant has voiced that she is only capable of performing any tasks for about 30 minutes, including the use of her computer. Working from the home could possibly be an option, however the claimant has indicated she does not plan to return to any type of work environment. There is also the possibility working from the home could cause a stressful situation, increasing symptoms. Limitations in regard to return to work are noted to be the trach and appearance, need for frequent suctioning, daily oxygen needs as needed, dressing changes daily included throughout the day, easily fatigued and need for frequent rest periods.[35]

Based on this information, and particularly on plaintiff's statement that she was not interested in returning to work, Met Life indicated in plaintiff's file on November 22, 2000, that it did not consider her a good candidate for vocational rehabilitation, and it closed her file with regard to rehab at that time.[36]

In 2001, Met Life again requested continued proof of plaintiff's disability. Met

---

[35] *Id.* at document bearing Bates Stamp No. Met Life 00049.

[36] *Id.* at documents bearing Bates Stamp Nos. Met Life 00025-00026.

Life claims it sent plaintiff two letters in June and July of 2001, requesting additional medical records to support plaintiff's entitlement to benefits.[37]   However, Met Life did not produce a copy of these letters, and plaintiff disputes that she ever received them.  Met Life subsequently sent plaintiff a letter on August 20, 2001, stating:

> We wrote to you on June 15, 2001 and July 19, 2001 requesting that you send us a current medical statement from your attending physician.  To date, we have not received a reply.
>
> As we still have not received the required medical statement showing your present condition, we can only assume that you are not claiming further benefits.  Therefore, no further benefits will be payable starting September 30, 2001.
>
> If the required medical statement is not received within 30 days, we will have to terminate your claim effective October 1, 2001.[38]

Met Life still did not receive the requested medical information, and it consequently sent plaintiff a letter on November 8, 2001, notifying her that her claim had been terminated, and reminding her that she had the right to request a review within sixty days after she received notice of the denial.[39]  Despite this clear directive, plaintiff did not contact Met Life until December of *2003*, when she wrote a letter requesting an appeal of the denial of her claim.  She stated:

> This is the third time I have sent a letter of appeal to ya'll [sic]

---

[37] *Id.* at documents bearing Bates Stamp Nos. Met Life 00026, 00034, & 00035.

[38] *Id.* at document bearing Bates Stamp No. Met Life 00034.

[39] *Id.* at document bearing Bates Stamp No. Met Life 00035.

and they say you have not received them.  I am writing this letter to get
my disability picked back up from Sept. 2001 when you all stopped
paying me.  I was unaware for over a year that you were not paying me.
My exhusband was taking care of all our business and he told me
nothing when I became aware of what he was doing it has taken awhile
[sic] to get things together and try to fix what he's done.  I sent the first
appeal letter to yall [sic] over a month ago, then I sent another about two
weeks ago so I would appreciate some kind of response to let me know
that you received this letter.  I am still disabled.  I have not worked since
'96 . . . .[40]

Met Life's records do not reflect that plaintiff's ex-husband ever inquired about

plaintiff's claim, or that he was handling her affairs.

Met Life mailed plaintiff a letter on January 20, 2004, informing her:  "We are

unable to give your request further consideration since it was received December 23,

2003, which is two years beyond the expiration of the 60 day appeals submission time

period.  No further review or appeal of the denial will be considered."[41]  The file does

not reflect that plaintiff ever provided any additional medical records responsive to

Met Life's requests.  Plaintiff filed this suit on April 5, 2004.

## II.  DISCUSSION

As a threshold matter, the court must determine the appropriate standard for

reviewing Met Life's denial of plaintiff's claim for benefits, because ERISA does not

specify the standard applicable to the decisions of a plan administrator or fiduciary.

---

[40] *Id.* at documents bearing Bates Stamp Nos. Met Life 00031-00032.

[41] *Id.* at document bearing Bates Stamp No. Met Life 00033.

*See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49 F.3d 702, 705 (11th Cir. 1995) (other citation omitted)).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards of review applicable to the decisions of a claim administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests." *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997).[42] Here, the plan grants the claims administrator the discretion to construe the terms of the Plan, and to determine a claimant's eligibility for benefits. Accordingly, the "arbitrary and capricious" standard applies.[43]

---

[42] These standards apply not only to an administrator's interpretation of a plan term, but also to factual decisions of an administrator, such as the decision in this case to deny plaintiff's benefits. *See Shaw v. Connecticut General Life Insurance Co.,* 353 F.3d 1276, 1284-85 (11th Cir. 2003).

[43] Plaintiff seems to consent that the "arbitrary and capricious" standard applies. *See* doc. no. 15 (plaintiff's brief), at unnumbered page 6.

To determine whether the administrator's decision was arbitrary and capricous, the court must first "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (*i.e.,* the court disagrees with the administrator's decision)." *Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004) (citing *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.,* 240 F.3d 982, 993 n.23 (11th Cir. 2001)). If the decision was not "wrong," the inquiry is ended and the administrator's decision will be affirmed. *Williams,* 373 F.3d at 1138.

If the administrator's decision is "wrong," then, under the arbitrary and capricious standard of review, the court next must "determine whether 'reasonable grounds' supported it." *Id.* (citation omitted). Stated differently,

> [w]hen conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.

*Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1139 (11th Cir. 1989) (citations omitted). A reasonable decision will be upheld as not being arbitrary and capricious "even if there is evidence that would support a contrary decision." *Id.* at 1140.

Met Life offers two, primary arguments to support the proposition that its

decision to deny plaintiff's benefits was not arbitrary and capricious.  First, Met Life asserts that plaintiff failed to submit proof of continued disability as required by the Plan.  Second, Met Life asserts that plaintiff failed to exhaust her administrative remedies before filing suit.

## A.     Failure to Provide Proof of Continued Disability

Met Life asserts that plaintiff is not entitled to benefits under the Plan because she failed to provide requested medical information to establish her continued disability.

A plan participant's entitlement to benefits "can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document." *Alday v. Container Corp. of America,* 906 F.2d 660, 665 (11th Cir. 1990) (citing *Moore v. Metropolitan Life Insurance Co.,* 856 F.2d 488, 492 (2d Cir. 1988)). Here, the Plan documents require a claimant to submit proof of disability before benefits will be paid, and to submit proof of *continued* disability upon request in order to maintain benefits.[44]  The last medical records in plaintiff's claim file are dated November of 2000.  Met Life requested that plaintiff update her records to

---

[44] *See* defendant's evidentiary submission, appended to doc. no. 8, Tab 1 (Affidavit of Laura Sullivan), Exhibit B (Claim File), at documents bearing Bates Stamp Nos. Met Life 00356-00357 ("The Monthly Benefit will be paid to you after completion of the Elimination Period, shown in the SCHEDULE OF BENEFITS, *provided you remain Disabled and proof of continued Disability is submitted, at your expense, to us upon request.*") (emphasis supplied).

provide proof of continuing disability on June 15 and July 19, 2001. Plaintiff did not respond to Met Life's requests. On August 20, 2001, Met Life cautioned plaintiff that if she did not produce supplemental medical records, her benefits would be terminated. Plaintiff still did not provide the requested records, and Met Life consequently terminated her benefit payments on November 8, 2001.

These circumstances are analogous to those presented in *Buckley, supra,* another case involving a long-term disability plan issued by Met Life. In *Buckley,* the plan

> provided that a recipient of disability income might "be required not more often than semi-annually to undergo a medical examination by a physician or physicians appointed by the Committee and/or submit evidence of continued Total Disability satisfactory to the Committee." The Plan further stipulated that "if the Member refuses to submit to a medical examination or to submit evidence of Total Disability as required by the Committee, his disability income under the Plan shall cease as of the date of such determination or refusal."

*Buckley,* 115 F.3d at 937-38. Met Life requested Buckley to produce a medical form on several occasions, but Buckley did not comply. *Id.* at 938. Met Life subsequently informed Buckley that her benefits would be terminated effective September 1, 1992, if she did not produce the form. *Id.* Buckley did not comply in a timely manner, and Met Life consequently decided to terminate her benefit payments. *Id.* Buckley eventually did produce the requested form, but Met Life stood by its denial decision.

-18-

The district court, employing the "arbitrary and capricious standard," upheld Met Life's denial of benefits. The Eleventh Circuit affirmed on appeal, because Buckley "had failed to submit the required proof of her continuing disability." *Id.* at 941.

Similarly, here, Met Life provided plaintiff ample opportunity to submit proof of her continued disability, and she repeatedly failed to do so. Accordingly, Met Life had the right under the plain language of the Plan to terminate plaintiff's benefits, and it was not "wrong" or "unreasonable" for it to do so. *See id.* (Met Life's decision to deny benefits based on the claimant's failure to provide proof of disability was "reasonable"); *see also Grayer v. Liberty Life Assurance Co. of Boston,* 331 F. Supp. 2d 1383, 1390-91 (M.D. Fla. 2004) (the plan administrator's decision to deny long-term disability benefits due to the claimant's failure to provide requested medical information was "correct and reasonable").

Plaintiff's arguments to the contrary are unavailing. First, plaintiff asserts that Met Life may not have actually sent her letters in June and July of 2001, because copies of those letters are not in the administrative record. This fact is immaterial, however, because plaintiff does *not* dispute that Met Life sent letters in both August and November of 2001, or that she failed to submit any medical records after becoming aware of the denial of her claim.

Plaintiff also asserts that she was unaware both of Met Life's requests for

information, and of the denial of her claim, because her ex-husband had been handling her personal affairs, and he did not inform her of the requests or the denial. However, plaintiff stated in December of 2003 that she had been "unaware for over a year" that her benefits had ceased.[45]  By that time, plaintiff had not received benefits for more than *two* years.  She offers no explanation for why she was unaware she was not receiving benefits for the remainder of that two-year time period.  In addition, plaintiff offers no indication that she was incapable of handling her own affairs during this two-year time period.  Indeed, plaintiff's subsequent, untimely request for review of her claim, and her pursuit of this lawsuit, indicate that she *is* capable of managing her affairs.  Accordingly, she should have been aware of Met Life's correspondence, and the Plan language requiring her to submit continued proof of disability upon request.  *See Barnes v. Lacy,* 927 F.2d 539, 543 (11th Cir. 1991) (holding that participants in an ERISA plan had constructive knowledge of the plan's terms).

Additionally, plaintiff asserts that Met Life should never have ceased paying her benefits because it already had sufficient information in the record to support her disability.  It is true that plaintiff's medical records reflected she had a permanent tracheostomy, and that she suffered from impairments in her speech and activities due

---

[45] *Id.* at documents bearing Bates Stamp Nos. Met Life 00031-00032.

to her condition.  Indeed, portions of plaintiff's medical records indicated that she was "permanently and totally disabled," that her condition was not likely to improve, and that she had exhausted certain treatment options.  These statements are not dispositive, however, because the Plan requires proof of *continued* disability upon request.  In *Buckley,* the Eleventh Circuit upheld the plan administrator's denial of disability benefits based on Buckley's failure to provide proof of continued disability, despite a physician's prior indication that Buckley was "permanently and totally disabled."  *Buckley,* 115 F.3d at 938.  The Court stated:

> It is important to understand that Buckley's benefits were not terminated because the Committee found that she was no longer disabled, but because she had failed to submit the required proof of her continuing disability.  At the time the Committee voted to terminate Buckley's benefits on December 8, 1992, it had not received the required form attesting to Buckley's continuing disability or any other written communication regarding the matter from Buckley since the previous May.  Based on those facts, the Committee's decision was clearly not arbitrary and capricious.

*Id.* at 941.

Similarly, here, Met Life did not deny plaintiff's continued benefits because she was no longer disabled.  Rather, it denied her benefits because she did not produce the required proof of her continued disability.[46]

---

[46] Further, the medical records which were in plaintiff's claim file reflected some inconsistencies.  In addition to the statements that plaintiff was permanently disabled, there were also indications that she had some chance for improvement, or that she retained some capacity to work.  The initial Attending Physician Statement plaintiff submitted stated that "hopefully [plaintiff's]

Finally, plaintiff asserts that Met Life "arbitrarily and capriciously decided not to obtain further medical evidence of their own investigation, as they had previously done on numerous occasions in the past concerning this claim."[47]  However, plaintiff cites no authority to support the proposition that Met Life had a duty to independently request information to support her entitlement to benefits.  To the contrary, a plaintiff suing for a denial of benefits under ERISA "bears the burden of proving [her] entitlement to contractual benefits."  *Horton v. Reliance Standard,* 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Insurance Co.,* 979 F.2d 653, 658 (8th Cir. 1992)).  "This burden is the same whether or not the administrator denies a claim initially or decides to discontinue benefits after initially approving them."  *Richards v. Hartford Life and Accident Insurance Co.,* 356 F. Supp. 2d 1278, 1284 (S.D. Fla. 2004) (citing *Hufford v. Harris Corp.,* 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004)).

In other words, there is no shifting of the claimant's burden of proof to establish a disability once a plan administrator honors a claim.  As a

---

condition will be successfully treated and she will be able to resume work." *Id.* at document bearing Bates Stamp No. Met Life 00345. Following plaintiff's tracheostomy, Met Life noted that plaintiff might be able to return to some type of work after a period of recovery. *Id.* at documents bearing Bates Stamp Nos. Met Life 00019-00020.  The home study evaluation summary completed by Registered Nurse Opal Newsome in November of 2000 indicated that plaintiff might be able to work from home.  Given these inconsistencies in the reports about plaintiff's condition, it was not "unreasonable" for Met Life to request additional medical records to support plaintiff's *continued* entitlement to disability

[47] Plaintiff's brief, at unnumbered page 8.

result of the payment of benefits, the plan does not incur the burden of showing a change in claimant's condition in order to justify a termination of benefits; the claimant retains the burden of proving continued disability.

*Hufford,* 322 F. Supp. 2d at 1360 (citation omitted). The language of the Plan comports with this legal principle, as it requires *a claimant* to provide medical documentation, upon Met Life's request, to support a continued disability.[48]

In summary, it was not "wrong" for Met Life to deny plaintiff's claim for disability benefits, because plaintiff failed to provide proof of continued disability, as required by the Plan. Even if Met Life's denial of benefits could be considered "wrong," however, Met Life's decision was not "arbitrary and capricious," because it had a reasonable basis for the denial.

---

[48] Plaintiff also suggests that Met Life's denial of benefits was arbitrary and capricious because it occurred after plaintiff stated she did not intend to return to the workforce. *See* plaintiff's brief, at unnumbered page 9. Plaintiff seems to imply that Met Life has a pattern of requesting additional medical information to support a continued disability, and denying plaintiff's benefits for failure to provide the requested information, only after plaintiff has stated her intention to not return to the workforce. Plaintiff cites no authority to support her argument that these circumstances constitute an abuse of Met Life's discretion. In addition, the court finds no support for plaintiff's theory in the record. It is true that the first denial of plaintiff's benefits in October of 1998 occurred approximately ten months after plaintiff informed Met Life of her intent not to rejoin the workforce. The second denial of plaintiff's benefits occurred approximately one year after plaintiff formed Opal Newcomb, the Registered Nurse hired by Met Life, that she did not intend to return to the work force. These time gaps of ten months and one year, respectively, are not sufficiently close to suggest a causal connection between plaintiff's statements of intent, and Met Life's subsequent denials of benefits. Further, a more careful examination of the record reflects that, both times Met Life denied plaintiff's claim for benefits, it did so after a long period of receiving no medical records from plaintiff, despite repeated requests from Met Life. Plaintiff's suggestion of some improper motive on the part of Met Life simply is insufficient to overcome the fact that plaintiff was required to submit proof of continued disability upon request, and she failed to do so.

**B.    Failure to Exhaust Administrative Remedies**

Met Life also argues that plaintiff failed to exhaust her administrative remedies prior to filing suit.[49] It is well-settled that "'plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court.'" *Perrino v. Southern Bell Telephone & Telegraph Co.,* 209 F.3d 1309, 1315 (11th Cir. 2000) (quoting *Counts v. American General Life and Accident Insurance Co.,* 111 F.3d 105, 108 (11th Cir. 1997), and also citing *Springer v. Wal-Mart Associates' Group Health Plan,* 908 F.2d 897, 899 (11th Cir. 1990), and *Mason v. Continental Group, Inc.,* 763 F.2d 1219, 1225-27 (11th Cir. 1985)).   This exhaustion requirement is "strictly enforce[d]" by the Eleventh Circuit, and it applies when an ERISA plaintiff fails to request a timely review of the denial of her claim.   *Perrino,* 209 F.3d at 1315.

For example, in *Stephenson v. Provident Life & Accident Insurance Co.,* 1 F. Supp. 2d 1326 (M.D. Ala. 1998), the insurer terminated Stephenson's disability benefits and informed her that she had 60 days to request an appeal, in accordance with the applicable plan documents.   *Id.* at 1330-31.   Stephenson requested a review of the denial approximately two and one-half months after the sixty-day period had expired.   *Id.*   The insurer consequently denied her appeal as untimely, and when

---

[49] Plaintiff offers little response to defendant's exhaustion argument, except to state, "[c]learly, Ms. Willmon's claim for URISA [sic] benefits was timely in the court system." Plaintiff's brief, at unnumbered page 9.

Stephenson later filed suit, the district court entered summary judgment on behalf of the insurer due to Stephenson's failure to exhaust administrative remedies. *Id.* at 1331-32.

Similarly, here, the People's Plan requires a participant whose benefits are denied to file a request for review within sixty (60) days of receiving notice of the denial. In the denial letter Met Life sent to plaintiff on November 8, 2001, it reminded her of this sixty-day appeal period. Nonetheless, plaintiff did not contact Met Life to request a review of her claim until December of 2003, more than two years later. Plaintiff's request clearly was untimely, and Met Life was entitled to decline plaintiff's appeal. Accordingly, plaintiff failed to exhaust her administrative remedies under the Plan, and summary judgment is due to be granted on those grounds. *See, e.g., Perrino,* 209 F.3d at 1319 (affirming the entry of summary judgment due to failure to exhaust administrative remedies); *Counts,* 111 F.3d at 109 (same); *Merritt v. Confederation Life Insurance Co.,* 881 F.2d 1034, 1035 (11th Cir. 1989) (same).

## III. CONCLUSION

In accordance with the foregoing, summary judgment is due to be granted on plaintiff's ERISA claim because she failed to provide proof of continued disability, as required by the Plan, and because she failed to exhaust her administrative remedies

before filing suit.[50]   An appropriate order will be entered contemporaneously herewith.

DONE this 28th day of November, 2005.

_____
United States District Judge

---

[50] Plaintiff's state law claims for bad faith and breach of contract also are due to be dismissed, because they are preempted by ERISA.  *See Gilbert v. Alta Health & Life Insurance Co.,* 276 F.3d 1292, 1296-1301 (11th Cir. 2001) (ERISA preempts bad faith claims); *Swerhun v. Guardian Life Insuarnce Co.,* 979 F.2d 195, 198 (11th Cir. 1992) (ERISA preempts breach of contract claims).